1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   JOHN HEALY,
                                        NO. CIV. S-02-1575 LKK/DAD
12          Plaintiff,

13       v.                                      O R D E R

14   MCI WORLDCOM NETWORK
     SERVICE, INC., a Delaware,
15   corporation; ELECTRONIC
     DATA SYSTEMS CORPORATION,
16   a foreign corporation; and
     EDS/SHL CORPORATION, a Delaware
17   corporation,

18          Defendants.
     _____/
19

20       Plaintiff, John Healey, filed suit against defendants, MCI

21   Worldcom Network Services, Inc., Electronic Data Systems

22   Corporation, and EDS/SHL Corporation, alleging various causes of

23   action.  Plaintiff's claims arise from defendants' purported

24   failure to adhere to a separation agreement entered into on

25   September 10, 1998.  Plaintiff seeks damages in the amount of

26   $906,084.25 in addition to prejudgment interest, attorney's fees

                                    1

and punitive damages.

Pending before the court are the parties' cross-motions for summary judgment and/or partial summary adjudication.  The causes of action at issue in these motions are the breach of contract, fraud, and intentional infliction of emotional distress claims.[1]

# I.

# FACTS[2]

SHL Systemhouse Inc. ("Systemhouse"), a systems integration company, hired plaintiff, John Healy, on June 4, 1993, as its Vice President of National Systems.  Plaintiff's job duties included managing, developing, and growing state government business.  Def.'s SUF 1.  Approximately a year later, Systemhouse decided to get out of the state government business. On July 18, 1994, plaintiff and Systemhouse entered into a "Settlement Agreement" where Systemhouse agreed to terminate plaintiff on or before December 31, 1994, if the company did not sell its state government line of business or if it did not agree to make it a part of its "core strategy."  Under the agreement, Systemhouse promised to pay plaintiff $262,500 upon his separation.  Def.'s SUF 2.

Systemhouse did not separate plaintiff on December 31, 1994 despite the agreement.  Instead, Systemhouse retained plaintiff

---

[1]  In his opposition, plaintiff withdrew three other causes of action.

[2]  All facts are undisputed unless otherwise noted.

2

and entered into another settlement agreement on February 28, 1995. As part of that agreement, Systemhouse agreed to pay plaintiff $262,500 if it terminated his employment in the future without cause. Def.'s SUF 3.

Shortly thereafter, MCI Communications Corporation purchased Systemhouse. Following the purchase, the company was known as "MCI Systemhouse." Plaintiff remained employed in the same capacity after the acquisition. Def.'s SUF 4. As an MCI Systemhouse executive, plaintiff received options to purchase MCI stock. In his deposition, plaintiff explained that he was awarded a "certain number of options on an annualized basis as part of [his] overall compensation." He believed they vested, "one-third, one-third, one-third," and were exercisable after "one year, two years, three years." Plaintiff testified that he believed the stock options had a total life of ten years, and that they were not exercisable thereafter. Def.'s SUF 5, citing Healy Dep. at 57.

In early 1998, MCI Systemhouse informed plaintiff of its decision to discontinue the state government services. Barbara Iman, Vice President of Human Resources, explained to plaintiff that MCI Systemhouse would terminate him without cause due to that decision. Def.'s SUF 7. On May 19, 1998, the parties entered into a "Separation Agreement and General Release," that set forth the term of Plaintiff's separation. The agreement provided the plaintiff would be retained "through August 1, 1998 at which time [he] will be terminated." The agreement further

3

provided that MCI Systemhouse would pay plaintiff $262,500 in
severance within ten days of his termination.  It also stated
that plaintiff "will be permitted to exercise his stock option
grants in accordance with MCI's Stock Option Plan.  The terms
and conditions of the deferred incentive program for a
termination without cause will apply."  Def.'s SUF 8.  Although
plaintiff agreed to an August 1, 1998 separation date, he told
his manager that he hoped to stay employed longer because he
expected MCI to merge with Worldcom in the near future.  Def.'s
SUF 9.

    On July 22, 1998, plaintiff learned that MCI Systemhouse
agreed to continue his employment through December 31, 1998.
Although plaintiff wished to work through the end of the year,
he wanted to ensure that he had the right to file for disability
benefits during that time.  Over the course of several weeks,
plaintiff worked with Barbara Iman to reach an agreement that
would permit him to work through the end of the year and still
be able to file for disability benefits, if necessary.  Def.'s
SUF 10.

    On July 30, 1998, Iman told plaintiff that if an employee
who is to be terminated files for disability, that individual's
separation is placed on hold until he or she returns from
disability leave.  According to Iman, under MCI's disability
policy, an employee who was on disability could not be
terminated.  Iman also told plaintiff that he needed to file for
disability benefits by the end of the next day because his

1 employment was to terminate on August 1, 1998 per the separation

2 agreement.  Def.'s SUF 11.

3      Iman proposed that plaintiff be separated as agreed on

4 August 1, 1998 on the following day, but be retained thereafter

5 as an independent contractor.  Under that scenario, however,

6 plaintiff would not be entitled to long-term disability benefits

7 as an independent contractor.  Plaintiff did not agree to Iman's

8 proposal.  Per the May 1998 separation agreement, plaintiff was

9 to be separated the next day, but MCI did not separate him on

10 August 1, 1998.  Rather, on August 3, 1998, Iman told plaintiff

11 that MCI would draft a new agreement with a December 31, 1998

12 separation date.  Plaintiff continued to work as the parties

13 prepared the new agreement.

14      On August 19, 1998, Iman told plaintiff that if he went on

15 disability leave prior to December 31, 1998, he would not be

16 terminated.  She explained that he would not be separated until

17 he returned from the disability leave, at which time he would

18 receive severance pay, because his severance payment was "100%

19 tied to date of separation."  Iman explained that Systemhouse

20 could not legally terminate plaintiff if he were on disability.

21 See Healy Dep. at 129-135; Iman Dep. at 101-102 (2002); Pl.'s

22 Ex. U (Iman e-mail stating that "legally Systemhouse could not

23 terminate [plaintiff] until he returned from disability").

24 Plaintiff questioned the appropriateness or accuracy of these

25 statements, but did not investigate their accuracy until after

26 December 31, 1998.  Def.'s SUF 15.

1   Plaintiff and MCI Systemhouse Corp. eventually entered into

2   a revised "Separation Agreement and General Release" on

3   September 10, 1998 ("Revised Separation Agreement").  Although

4   the initial separation agreement stated that plaintiff would be

5   separated on August 1, 1998, he remained employed -

6   notwithstanding the absence of a new agreement - for more than

7   five weeks before accepting the revised agreement.  Def.'s SUF

8   15; Pl.'s SUF 1, 2.  The Revised Separation Agreement provided

9   that: "Subject to Employee's compliance with Paragraph 1.4

10  below, MCI agrees to retain employee at his current annual base

11  rate of salary, through December 31, 1998, at which time

12  Employee will be terminated.  Employee's termination will be

13  designated as a termination without cause.  MCI further agrees

14  to continue to pay Employee his bi-weekly guaranteed through

15  December 31, 1998, or his actual date of termination if

16  earlier."  Def.'s SUF 16.

17  The Separation Agreement executed by Healy in September

18  1998 provided that "MCI will pay Employee a lump sum payment in

19  the amount of $262,500 within 10 days of his termination."

20  Pl.'s SUF 4.  Paragraph 1.3 of the Separation Agreement

21  specified that:

22      Upon the full completion and execution of the
        Agreement and Release, Employee will remain eligible
23      to receive his Retention Bonus in accordance with
        Program Guidelines and will be considered an
24      involuntary termination without cause.  Employee will
        be permitted to exercise stock option grants in
25      accordance with MCI's Stock Option Plan.  The terms
        and conditions of the 1997 deferred incentive program
26      for a termination without clause will apply . . . .

6

1  Pl.'s SUF 5.

2       Paragraph 3.5 of the "Non-Qualified Stock Option Agreement

3  for Key Employees (1998 Options)" ("Stock Option Plan")

4  stipulated:

5       **Disability**: Notwithstanding Section 3.3, if you become
        disabled, the Option will be exercisable for one
6       year from the date you commence receiving benefits
        under a Company sponsored Short-Term Disability Plan . . .
7       (Exhibit I)

8       Plaintiff also received stock options under the terms of an

9  Incentive Stock Unit ("ISU") plan in 1997 and 1998.  Under the

10 terms of the ISU plan, plaintiff could defer any portion of his

11 incentive pay each year.  MCI Systemhouse matched 25 percent of

12 the amount deferred by plaintiff.  The deferred incentive pay

13 and the employer match were used to purchase MCI stock.  The

14 parties dispute whether the options vested over the course of

15 three years, like the stock options, or would have accelerated

16 under the agreement and would have vested by December 31, 1998.

17 Def.'s SUF 6.  MCI's Incentive Stock Unit Agreement, dated

18 February 5, 1997 states:

19      **3.4 Disability**  If you become disabled as that term is
        defined in the Company's short or long term disability
20      plan, as the case may be, but remain employed, your
        Units will continue to vest according to the schedule
21      set forth in Section 3.2 for the duration of your
        disability.

22

23 Section 3.2 reads:

24      **3.2 Requirement of Active Employment on Each Vesting
        Date.** The incentive Stock Award Units and the Matching
25      Award Units will become vested and nonforfeitable only
        to the extent of 33% on each of the first and second
26      anniversaries and 34% on the third anniversary of the

                                7

1   Grant Date (each, a "Vesting Date") so long as you are
    employed by the Company on each Vesting Date.  If you
2   are not employed with the Company or any affiliate of
    the Company on a Vesting Date, all non-vested Units
3   will be forfeited . . . .

4  Pl.'s Ex. E.

5       The agreement also indicated that "MCI and Employee

6  acknowledge that this Agreement does not modify any term,

7  condition, or provision of the MCI Communications Corporation

8  Stock Option Plan or any stock option agreement previously

9  entered into by the Parties."

10      Despite the prior conversation between plaintiff and Iman

11  concerning his potential disability status, the agreement was

12  silent concerning what would happen if plaintiff were on

13  disability leave as of December 31, 1998.  Def.'s SUF 18.

14      On December 8, 1998, plaintiff filed for disability

15  benefits under MCI's ERISA disability plans.  Hartford Life

16  Insurance Company ("Hartford"), the administrator of MCI's

17  disability plans, approved plaintiff's application for short

18  term and subsequently long-term disability benefits.  Plaintiff

19  relied on the head of Human Resources and believed what she told

20  him, so he never asked if he could continue to receive

21  disability benefits if his employment were terminated.  Def.'s

22  SUF 19.

23      In January 1999, plaintiff contacted Iman and inquired

24  about his severance payment.  She informed him that, consistent

25  with their prior discussions, he would not be terminated until

26  he returned from disability, so he was not entitled to his

1   severance payment at that time.  Even though plaintiff believed

2   the separation agreement contained a termination date, he

3   accepted the explanation that he would not be terminated until

4   after he came back to employment from disability.  Def.'s SUF

5   20, citing Healy Dep. at 147:4-20.

6        On or about April 22, 1999, defendant Electronic Data

7   Systems Corporation purchased MCI Systemhouse, and that entity

8   became known as EDS.  Following the merger, on May 1, 1999,

9   plaintiff moved to the MCI corporate payroll because he was

10  receiving disability benefits, and those benefits could not

11  transfer to EDS.  EDS never carried plaintiff as an employee on

12  its records.  Def.'s SUF 21.

13       In August 1999, plaintiff inquired of EDS as to who would

14  pay his severance when he returned from disability leave.

15  In-house counsel for EDS, responded to plaintiff's inquiry that

16  "[i]t appears from the MCI LTD [long term disability] website

17  that an employee can perhaps continue to receive MCI LTD

18  benefits even though he/she is no longer an active MCI employee,

19  so long as he/she was an active employee when he/she commenced

20  benefits."  Plaintiff spent the following two years trying to

21  determine who would pay his severance when he either returned

22  from disability leave, died or turned age 65.  On March 14,

23  2002, in response to plaintiff's inquiry as to whether EDS or

24  MCI would pay his severance when he returned from disability

25  leave, counsel for MCI told plaintiff that he could have been

26  terminated in December 1998 even if he were receiving disability

1  benefits.  In 2002, plaintiff demanded that MCI terminate his

2  employment retroactive to December 31, 1998, and make him whole

3  for his alleged damages.  Def.'s SUF 23.

4      It is now undisputed that MCI's long-term disability plan

5  would allow plaintiff to continue receiving long-term disability

6  benefits if he were terminated.  Nevertheless, MCI's practice in

7  its administration of the long-term disability plan was not to

8  terminate employees who were receiving disability benefits

9  pursuant to the plan.  Pl.'s SUF 3.  MCI claims that it never

10  terminated plaintiff because its actions are consistent with the

11  terms of the separation agreement and the understanding that

12  plaintiff would not be separated until he returned from

13  disability leave.  Plaintiff is, according to MCI, a current MCI

14  employee on a leave of absence.

15      As an MCI employee on disability leave, plaintiff is

16  eligible to receive MCI health benefits.  As of February 17,

17  2005, plaintiff received health care benefits.  He received

18  health benefits from MCI in prior years as well.  Def.'s SUF 24.

19      Plaintiff believed that the actual distribution of the

20  stock options was controlled by MCI.  Plaintiff asserts that MCI

21  failed to provide him access to the stock options he believed

22  vested as of December 31, 1998.  On March 20, 2000, MCI's stock

23  option plan administrator told plaintiff that the stock options

24  plaintiff believed should have vested no later than February 5,

25  2000 would not vest because he was on disability leave.  Def.'s

26  SUF 25.

1    On June 13, 2002, plaintiff brought this action against

2    EDS, as well as MCI WorldCom Network Services, Inc., the parent

3    of MCI Systemhouse.  On July 21, 2002 and November 8, 2002, MCI

4    WorldCom filed for Chapter 11 Bankruptcy.  On July 28, 2004,

5    plaintiff and EDS agreed to dismiss MCI WorldCom from this

6    action, without prejudice.  On August 8, 2004, the court

7    dismissed MCI WorldCom from the suit.  Def.'s SUF 26.

8                               **II.**

9         **SUMMARY JUDGMENT STANDARDS UNDER FED. R. CIV. P. 56**

10    Summary judgment is appropriate when it is demonstrated

11   that there exists no genuine issue as to any material fact, and

12   that the moving party is entitled to judgment as a matter of

13   law.  Fed. R. Civ. P. 56(c); See also Adickes v. S.H. Kress &

14   Co., 398 U.S. 144, 157 (1970); Secor Limited v. Cetus Corp., 51

15   F.3d 848, 853 (9th Cir. 1995).

16    Under summary judgment practice, the moving party

17              [A]lways bears the initial responsibility of
                informing the district court of the basis
18              for its motion, and identifying those
                portions of "the pleadings, depositions,
19              answers to interrogatories, and admissions
                on file, together with the affidavits, if
20              any," which it believes demonstrate the
                absence of a genuine issue of material fact.

21

22   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here

23   the nonmoving party will bear the burden of proof at trial on a

24   dispositive issue, a summary judgment motion may properly be

25   made in reliance solely on the 'pleadings, depositions, answers

26   to interrogatories, and admissions on file.'"  Id.  Indeed,

                                11

summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); See also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Secor Limited, 51 F.3d at 853.

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; See also First Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir. 1998).  The opposing party must demonstrate that the

1  fact in contention is material, i.e., a fact that might affect
2  the outcome of the suit under the governing law, Anderson v.
3  Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local
4  No. 169, Assoc. of Western Pulp and Paper Workers, 971 F.2d 347,
5  355 (9th Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific
6  Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and
7  that the dispute is genuine, i.e., the evidence is such that a
8  reasonable jury could return a verdict for the nonmoving party,
9  Anderson, 477 U.S. 248-49; see also Cline v. Industrial
10 Maintenance Engineering & Contracting Co., 200 F.3d 1223, 1228
11 (9th Cir. 1999).

12     In the endeavor to establish the existence of a factual
13 dispute, the opposing party need not establish a material issue
14 of fact conclusively in its favor.  It is sufficient that "the
15 claimed factual dispute be shown to require a jury or judge to
16 resolve the parties' differing versions of the truth at trial."
17 First Nat'l Bank, 391 U.S. at 290; See also T.W. Elec. Serv.,
18 809 F.2d at 631.  Thus, the "purpose of summary judgment is to
19 'pierce the pleadings and to assess the proof in order to see
20 whether there is a genuine need for trial.'"  Matsushita, 475
21 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's
22 note on 1963 amendments); see also International Union of
23 Bricklayers & Allied Craftsman Local Union No. 20 v. Martin
24 Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

25     In resolving the summary judgment motion, the court
26 examines the pleadings, depositions, answers to interrogatories,

13

and admissions on file, together with the affidavits, if any.
Rule 56(c); <u>See also</u> <u>In re Citric Acid Litigation</u>, 191 F.3d
1090, 1093 (9th Cir. 1999).  The evidence of the opposing party
is to be believed, <u>see</u> <u>Anderson</u>, 477 U.S. at 255, and all
reasonable inferences that may be drawn from the facts placed
before the court must be drawn in favor of the opposing party,
<u>see</u> <u>Matsushita</u>, 475 U.S. at 587 (citing <u>United States v.</u>
<u>Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (<u>per</u> <u>curiam</u>)); <u>See also</u>
<u>Headwaters Forest Defense v. County of Humboldt</u>, 211 F.3d 1121,
1132 (9th Cir. 2000).  Nevertheless, inferences are not drawn
out of the air, and it is the opposing party's obligation to
produce a factual predicate from which the inference may be
drawn.  <u>See</u> <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp.
1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th
Cir. 1987).

     Finally, to demonstrate a genuine issue, the opposing party
"must do more than simply show that there is some metaphysical
doubt as to the material facts. . . . Where the record taken as
a whole could not lead a rational trier of fact to find for the
nonmoving party, there is no 'genuine issue for trial.'"
<u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

### III.

### ANALYSIS

     Plaintiff argues that SHL Systemhouse's failure to pay him
$262,500 severance payment and provide him access to his stock
options and incentive stock units ("ISUs") was "in complete

derogation of the written contract."  Pl.'s Mot. at 19.
Plaintiff requests that "the court order immediate payment of
the severance payment of $262,500, the ISUs in the amount of
$398,174.25, and the value of the stock options of $245,410.00,
for a total of $906.084.25."  Pl.'s Mot. at 20.  Defendants, on
the other hand, argue that plaintiff's claims are preempted by
the Employee Retirement Income Security Act ("ERISA"), that MCI
did not breach the separation agreement, and that his other
claims fail as a matter of law.

**A.  THRESHOLD ISSUES**

Before turning to the parties' contentions regarding the
causes of action, the court must consider several threshold
issues.

**1.  <u>EDS's Liability</u>**

It is undisputed that in April 1999 defendant Electronic
Data Systems Corp. purchased MCI Systemhouse, and that entity
became known as "EDS."  Following the merger, plaintiff was
moved to the MCI corporate payroll.  Def.'s SUF 21.  As
plaintiff points out, the question remains "as to which company
owns [sic] his severance obligations."  Pl.'s Ex. DD.  EDS
concedes that "it is liable as a successor corporation to MCI
Systemhouse (the subsidiary of MCI Worldcom) if MCI breached
Plaintiff's Separation Agreement."  Def.'s Opp'n at 10.  EDS,
however, also argues that it is not liable for damages flowing
from the stock options because it "lacked control over the stock
options [plaintiff] was to receive from MCI WorldCom."  Def.'s

15

1  Opp'n at 11.  EDS fails to further explain its position and

2  cites to no authority supporting the proposition.[3]  The court,

3  therefore, accepts EDS's general admission of liability as a

4  successor corporation for MCI Systemhouse's actions.

## 2.  Applicable Law

6      Plaintiff at one point suggests that New York law may be

7  applicable to the interpretation of the stock purchase

8  agreement.  Pl.'s Mot. at 9.  In their brief, defendants cite

9  exclusively to California law and nowhere does plaintiff dispute

10 this application of law.  Rather, plaintiff responds by citing

11 California law as applicable to the interpretation of the

12 contractual dispute.  See Pl.'s Mot. at 8-9.  Where, in a

13 diversity suit, the parties have assumed that California law

14 applies, the court may indulge the same assumption.  See

15 American Sheet Metal, Inc. v. Em-Kay Engineering Co., 478

16 F.Supp. 809, 811, n.1 (1979)(citing Brobeck, Phledger & Harrison

17 v. Telex Corp., 602 F.2d 866, 871, n.2 (9th Cir. 1979)).

## 3.  ERISA Preemption

19     Defendants contend that plaintiff's breach of contract,

20 fraud, and IIED claims are preempted by ERISA because they all

21 relate to his eligibility for, and receipt of, disability

---

[3]  It is not self-evident, as EDS apparently assumes, that
lack of control equates to lack of liability.  Thus, without at all
ruling, it might well be that given EDS' position as a successor
corporation, it is liable to plaintiff with a right of indemnity
from its predecessor.  In any event, given the lack of any
authority cited by EDS, the court will proceed based on EDS'
general acknowledgment that as a successor entity it is liable for
its predecessor's contracts.

1  benefits under MCI's disability plans.  Def.'s Mot. at 2.  The

2  argument is unavailing.

3       ERISA provides that it "shall supersede any and all state

4  laws insofar as they may now or hereafter relate to any employee

5  benefit plan."  29 U.S.C. § 1144(a).  The Supreme Court has

6  noted that "[t]his language is "conspicuous for its breadth."

7  Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138 (1990)

8  (citation omitted).  The Ninth Circuit, however, has held that

9  ERISA preemption "has reasonable limits."  Bogue v. Ampex Corp.,

10  976 F.2d 1319, 1322 (9th Cir. 1992), cert. denied, 507 U.S. 1031

11  (1993).  "[A] plaintiff's state law claim 'relates to' an

12  employee benefit plan, in the normal sense of the phrase, if it

13  has a connection with or relation to such a plan."  Shaw v.

14  Delta Air Lines, Inc., 463 U.S. 85, 96-97 (1983).  Four types of

15  state laws "relate to" ERISA plans and are therefore preempted:

16  1.  Laws that regulate the type of benefits or terms of ERISA

17  plans; 2.  Laws that create reporting, disclosure, funding, or

18  vesting requirements; 3.  Laws that provide rules for

19  calculation of the amount of benefits to be paid under ERISA

20  plans; and 4. Laws that provide remedies for misconduct growing

21  out of the administration of ERISA plans.  Martori Bros.

22  Distributors v. James-Massengale, 781 F.2d 1349, 1356-57 (9th

23  Cir.), as amended, 791 F.2d 799 (9th Cir.), cert denied, 479

24  U.S. 949, 1018 (1986).  The case at bar involves none of these

25  types of state laws.

26  ////

1    Plaintiff's claim does not challenge any benefits

2  determination made by an ERISA plan, the reporting, disclosure,

3  funding, or vesting requirements of the disability plan, the

4  amount of benefits paid to him under the plan, or any misconduct

5  arising out of MCI's administration of the disability plan.

6  Instead, plaintiff challenges defendants' actions as they relate

7  to the execution and performance of the terms and conditions of

8  the revised separation agreement, an issue wholly distinct from

9  the ERISA plan.  In sum, the instant case presents a set of

10  facts and state law claims with "too tenuous, remote, or

11  peripheral" a relationship to an ERISA-governed plan for

12  preemption.  Shaw, 463 U.S. at 100 n. 21.  Cf. Farr v. US West

13  Inc., 58 F.3d 1361, 1366 (9th Cir. 1995)(participants' fraud

14  state law claim was not preempted by ERISA where plaintiffs

15  challenged defendants' misrepresentations regarding tax

16  liability independent of the plan); Ellenberg v. Brockway, Inc.,

17  763 F.2d 1091, 1096 (9th Cir. 1985)(state law claims such as

18  fraud and deceit and breach of contract were preempted by ERISA

19  only where they related to the improper handling of claims under

20  benefit plans directly connected with the employee benefit

21  plan).

22  **B.  BREACH OF CONTRACT CLAIM**

23      **1.  <u>The Terms of the Agreement</u>**

24    Plaintiff maintains that, under the September 1998

25  separation agreement and general release, he was entitled to the

26  $262,500 plus all of his deferred income by way of ISUs and

18

1   stock options on or about December 31, 1998.  Pl.'s Repl. at 8.

2   Defendants argue that Systemhouse did not breach the separation

3   agreement, relying on the parties' course of conduct before and

4   after entering the separation agreement.  Def.'s Mot. at 7.

5   Defendants' argument is not persuasive.

6        It is undisputed that the separation agreement was silent

7   as to the potential implications of plaintiff's disability

8   status.  Def.'s SUF 18.  Defendants assert this silence equates

9   to ambiguity as to what would occur if plaintiff went on

10  disability status, so that extrinsic evidence may be received if

11  it "explains the ambiguity and fills in the gap in the

12  agreement."  Id. at 8.  I cannot agree.

13       It is established California law that if a reviewing court

14  determines that the language of a contract is "fairly

15  susceptible of either one of the two interpretations contended

16  for" by the parties, extrinsic evidence may be admitted.

17  Pacific Gas and Elec. Co. v. G.W. Thomas Drayage & Rigging, 69

18  Cal.2d 33, 40 (1968).  Nonetheless, it is equally well

19  established that the terms of an agreement must first be

20  examined before turning to extrinsic evidence and that

21  "extrinsic evidence is not admissible to add to, detract from,

22  or vary the terms of a written contract."  Id. at 39; See also

23  Cal. Civ. Proc. Code § 1856, subd. (a)(The court may not

24  consider extrinsic evidence of any prior agreement or

25  contemporaneous oral agreement to vary or contradict the clear

26  and unambiguous terms of a written, integrated contract.);

1  <u>Principal Mutual Life Ins. Co. v. Vars, Pave McCord & Freedman</u>,

2  65 Cal.App.4th 1469, 1478 (parol evidence may not be used "to

3  create a contract the parties did not intend to make" or "to

4  insert language one or both parties now wish had been

5  included.").

6       I turn to the language of the agreement to determine

7  whether it is ambiguous.  The revised separation agreement

8  provides:

9       **1.1.**  " . . . MCI agrees to retain Employee at his
         current annual base rate of salary, through December
10       31, 1998 at which time Employee will be terminated.
         Employee's termination will be designated as a
11       termination without cause."

12 Pl.'s Ex. P.

13      Put directly, Systemhouse and plaintiff agreed that

14 plaintiff was to be terminated without cause on December 31,

15 1998.  There simply is nothing ambiguous or uncertain about the

16 terms.  Thus, the court may not consider extrinsic evidence

17 because there are no terms contained within this contractual

18 clause which would be susceptible to more than one

19 interpretation.   Accordingly, the court holds that defendants

20 breached the September 1998 contract when they failed to

21 terminate plaintiff on December 31, 1998.[4]

22 ////

23 _____

24      [4]  Although defendants do not claim that an oral agreement
   between the parties modified plaintiff's termination date, the
   court notes that the contract itself precludes modification of the
25 written contract by any oral agreement.  The separation agreement
   makes explicit that "[t]his agreement may be modified only in
26 writing, signed by both Parties."

### 2.   Defendants' Obligations to Plaintiff under the Separation Agreement

#### a.   $262,5000 Severance

Plaintiff contends that he is entitled to $262,500.00, the value of the ISUs in the amount of $398,174.25, and the value of the stock options of $245,410, for a total of $906,084.25. Under the revised separation agreement, the language is unambiguous with regard to the lump sum amount, the agreement provides that "MCI will pay Employee a lump sum payment in the amount of $262,500 within ten days of his termination."  Pl.'s Ex. P.  Because the court has concluded that defendants were required to terminate plaintiff on December 31, 1998, it follows that plaintiff was owed the amount of $262,500 within ten days of his termination.[5]

Plaintiff also contends that he is entitled to prejudgment interest.  His position finds support in California law. "Section 3287 of the California Civil Code provides for an award of prejudgment interest whenever a plaintiff prevails in a breach of contract claim for an amount of damages that is

---

[5]  On December 4, 2001, MCI WorldCom filed a complaint in state court in San Francisco seeking a declaration that the obligation to make the severance payment to Healy lies wholly with SHL, and that MCI WorldCom is not obligated to make the severance payment to Healy now or at any time hereafter.  Pl.'s Ex. HH. Plaintiff mentions this briefly in his papers, Pl.'s Mot. at 4, but the parties do not disclose what relief, if any, the court granted in this declaratory action.  It may be that whatever relief the court granted is irrelevant because on July 28, 2004 plaintiff and EDS agreed to dismiss MCI WorldCom from this case, without prejudice, and the court subsequently dismissed MCI WorldCom on August 8, 2004.  Def.'s SUF 26.

21

1  certain or is capable of being made certain by calculation."

2  <u>Unocal Corp. v. Unites States</u>, 222 F.3d 528, 541 (9th Cir.

3  2000).  Where, as here, when the prejudgment interest rate is

4  not stipulated to in the contract, the legal rate of interest is

5  ten percent.  Cal. Civ. Code § 3289(b); <u>see</u> <u>id.</u>  Accordingly,

6  plaintiff is entitled to prejudgment interest at the rate of ten

7  percent annually, accruing at the time his $262,500 was due.

8               **b.  Incentive Stock Units (ISUs)**

9       Plaintiff contends that upon his termination on December

10  31, 1998, he should have been allowed to immediately vest and

11  sell his own deferred compensation, or ISUs, which would have an

12  additional value of $398,194.25.  Plaintiff relies on language

13  contained in the separation agreement which specifies that

14  "[t]he terms and conditions of the 1997 deferred incentive

15  program for a termination without cause will apply."  Paragraph

16  1.3, Pl.'s Ex. P.  Turning to the referenced document which

17  discusses the deferred incentive program, the "Incentive Stock

18  Unit Agreement," (Pl.'s Ex. E) the section regarding

19  "termination of employment not for cause" declares that "all

20  Your non-vested Units will fully vest on the date of your

21  termination of employment."  Sec. 3.7.

22       Defendants argue that the ISU agreement sets forth how an

23  employee's shares would vest while on disability,[6] and that this

24  disability provision should apply because "these are the terms

25  _____

26       [6]  Under the disability provision (3.4), plaintiff's ISUs
    continue to vest based on a three-year schedule.

that the parties understood would apply while plaintiff was on disability leave." Opp'n at 12. This argument is unavailing for several reasons.

If defendants wanted the disability provision rather than the "termination for cause" provision to apply as they relate to the deferred incentive program, they had every opportunity to make that clear in the separation agreement. Defendants failed to do so. Instead, defendants understood that plaintiff was intending to file for disability and nonetheless included language in the separation agreement providing that the termination without cause provision would apply. Because under the plain terms of the agreement the termination without cause provision applied, plaintiff's ISUs "fully vest[ed] on the date of his termination or employment." Pl.'s Ex. E.

Although the court has determined that the "termination without cause" provision applies to plaintiff's ISUs, it is less clear what amount he is owed under the ISU agreement. Plaintiff contends that he is owed $398,174.25 because under §4 of the ISU Agreement, "payment was due within 60 days following the maturity date of each portion of the units" (emphasis supplied)[7]

---

[7] Plaintiff explains that he had 8521 split adjusted stock units that matured as of February 5, 2000, and 1276 split adjusted stock units that matured as of February 14, 2001. According to the ISU argument, he maintains, they were due and payable as of April 5, 2000 and April 16, 2001, respectively. Plaintiff asserts that the 8521 split adjusted shares on April 5, 2000 had a value per unit of $43.81 for a total of $373,305.01, and that the value of the 1276 split adjusted units on April 16, 2001, based on split adjusted per unit value of $19.49 was $24,869.00.

1   Pl.'s Mot. at 6.  Plaintiff misstates the language of section 4.

2   Rather, the language is that within sixty days following the

3   maturity date of each portion of the units (the maturity date

4   being his date of termination), the company "will deliver to You

5   <u>shares</u> of MCI stock . . . ." (emphasis added).  Thus, the ISU

6   agreement contemplates that the stock would vest and mature on

7   the termination date and that such shares would be within

8   plaintiff's possession, but it does not follow that plaintiff

9   would have necessarily sold his stocks on its maturity date.  As

10  explained further below, defendants contend that genuine issues

11  of material fact remain concerning how much plaintiff is owed

12  with regard to his stock.  Opp'n at 13.  Defendants' point is

13  well-taken.  It appears to the court that the exact amount owed

14  to plaintiff under the ISU agreement is a factual question

15  appropriate for the jury as such determination rests on when

16  plaintiff would have sold his stock.

17          **c.  <u>Stock Options</u>**

18       Plaintiff contends that because he should have been

19  terminated without cause on December 31, 1998, he could have,

20  and would have, exercised a number of stock options.  Pl.'s Mot.

21  at 2, 5-7.  Plaintiff contends that he would have sold those

22  shares exactly 90 days after his termination, and that if he had

23  done so, the fair market value of those shares would be equal to

24  $245,410, or $92.12 (value of stock on March 30, 1999) minus the

25  strike price of $47.50 (Plaintiff's SUF 7).

26  ////

1    Defendants argue that the provision regarding "disability"

2    contained in the Stock Option Agreement applied to plaintiff's

3    stock options as of December 1999, so that plaintiff's stock

4    options would not vest upon his termination.  Opp'n at 11.

5    Defendants also maintain that plaintiff did not make a fair

6    estimate of the value of his alleged stock options.  They

7    contend that plaintiff cannot establish that he would have sold

8    his shares on any particular day, and that he relies on various

9    exhibits which do not conclusively establish the damages to

10   which he claims he is entitled.  See Exs. F, G, and AA.

11       As previously noted, the language contained in paragraph

12   1.3 of the September 1998 separation agreement provides:

> Upon the full completion and execution of the
> Agreement and Release, Employee will remain eligible
> to receive his retention bonus in accordance with program
> guidelines and will be considered an involuntary
> termination without cause.  Employee will be permitted
> to exercise stock option grants in accordance with
> MCI's Stock Option Plan.  The terms and conditions of
> the 1997 deferred incentive program for a termination
> without cause will apply.  Employee waives any right
> to receive future stock-option/ISU grants or post-
> merger retention bonuses (emphasis supplied).

Pl.'s Ex. P.  The "MCI Stock Option Plan," contains a provision

specifying how stock would vest if plaintiff were on disability

(Section 3.5) and another specifying how the stock would vest if

plaintiff were to be terminated by the company "other than for

cause" (section 3.3).[8]  See Pl.'s Ex. I.  Unlike the ISUs, where

---

25       [8]  Similar to the ISU document, the Stock Option Plan
     Agreement (Ex. I) contains a termination without cause provision
26   which states that "the unvested portion of the Option will become

the separation agreement explicitly specifies that the termination without cause provision applies, it is unclear which provision applies in this instance – the termination without cause provision or the disability provision.

Plaintiff argues that because the "termination without cause" terms apply to the ISUs, it would also apply to the stock options.  Pl.'s Mot. at 5.  Defendants contend that the Stock Option Agreement sets out how an employee's shares would vest while on disability leave, and these are the terms the parties understood applied while plaintiff was on disability leave.

It appears to the court that there is a latent ambiguity in the contractual language of the revised separation agreement, and accordingly, it would be appropriate to admit extrinsic evidence.  Under California law, even where an agreement "appears to be clear and unambiguous on its face, it may contain a latent ambiguity."  <u>Pacific Gas & Electric</u>, <u>supra</u> 39-40.  To determine whether a latent ambiguity exists, the trial court first receives any extrinsic evidence to determine whether the contract is reasonably susceptible to the interpretation urged

---

fully vested" on the date of termination, December 31, 1998.
It also contains a disability provision, which states that the options will be exercisable:
> ". . . for one year from the date [plaintiff] commence[s] receiving benefits under a Company sponsored Short-Term Disability plan, for a number of shares equally to the number, if any, as to which the Option is exercisable on the date [plaintiff] commence[s] receiving short-term disability benefits plus a prorated portion of the shares."
Pl.'s Ex. I.

1   by the party asserting the existence of an ambiguity.  <u>Pacific</u>

2   <u>Gas & Electric</u>, <u>supra</u> at 40.  If the language is reasonably

3   susceptible to the interpretation proposed, the extrinsic

4   evidence is admitted to aid the court in interpreting the

5   parties' objective intent.  <u>Id</u>. at 40.  Here, the language

6   contained in the 1998 Separation agreement is susceptible to

7   defendants' interpretation because the agreement merely states

8   that plaintiff would be permitted to exercise stock option

9   grants consistent with the plan, but does not specify which

10  provision of the stock plan agreement would apply.  Opp'n at 12.

11      If, in light of the extrinsic evidence, only one

12  interpretation of the contract is reasonable, the issue may be

13  resolved as a matter of law.  If, however, the extrinsic

14  evidence is in conflict, thus raising a question of fact as to

15  which of the two reasonable interpretations of the contract was

16  intended by the parties, summary judgment is improper.  <u>See</u> <u>Wolf</u>

17  <u>v. Superior Court</u>, 114 Cal.App.4th 1343, 1351 (2004).  Here,

18  more than one interpretation exists as to how the stock options

19  should vest upon plaintiff's termination.  Thus, a question of

20  fact exists as to whether plaintiff's or defendants'

21  interpretation was intended by the parties.  Accordingly, the

22  court must reject both plaintiff's and defendants' motions for

23  summary judgment as to when the stock options would vest.

24  Similarly, the court cannot determine the value of the stock

25  options which plaintiff claims he is entitled to.  Plaintiff

26  contends that he would have sold those shares exactly 90 days

27

after his termination, and that if he had done so, the fair
market value of those shares would be equal to $245,410, or
$92.12 (value of stock on March 30, 1999) minus the strike price
of $47.50 (Plaintiff's SUF 7).  Defendants, however, state that
plaintiff cannot establish that he would have sold his shares on
any particular day.  This is a quintessential factual dispute
that must be reserved for the jury.

**C.   FRAUD CLAIM**

Under California law, in order to establish fraud, a
plaintiff must prove that: (1) the defendant made a false
representation; (2) the defendant had knowledge of the falsity
or "scienter"; (3) the defendant had the intent to defraud, i.e.
to induce reliance; (4) the plaintiff justifiably relied on the
defendants misrepresentation; (5) damages resulted.  City
Solutions, Inc. V. Clear Channels Communications, Inc., 365 F.3d
835, 839 (9th Cir. 2004).

Plaintiff bases his fraud claim on Barbara Iman's
representation that he could not be terminated and retain his
disability benefits at the same time.  Barbara Iman avers that
she believed her statements were true at the time she made them,
and there is nothing in the evidence which directly demonstrates
that she had knowledge that her representation was false at the
time they were made. Nonetheless, given her position in the
company, a jury might infer that she knew the representation was
false.  Equally, a reasonable jury might conclude that her
testimony was credible.  Plaintiff also offers no direct

28

1  evidence in support of his position that Barbara Iman lied with

2  the intent to defraud.  Once again, arguably a jury might find

3  that the misrepresentations benefitted the company thus

4  supplying a motive from which intent might be inferred.  On the

5  other hand, a jury might conclude there was no benefit to be

6  gained under the circumstances, thus negating an inference of

7  fraud.  As I pointed out long ago, "motive or intent [are] not

8  readily susceptible to resolution on a motion for summary

9  judgment."  Richards v. Nielsen Freight Lines, 602 F.Supp. 1223,

10  1231 (E.D. Cal. 1985).  In sum, the question of fraud and intent

11  are disputed issues of fact which a jury must resolve.

12      Defendants also argue that plaintiff's fraud claim is time-

13  barred under California's statute of limitations.  See Cal Civ.

14  Proc. Code § 338(d) (Statue of limitations for fraud is three

15  years).  As defendants note, the cause of action accrues when

16  the facts constituting the fraud are, or should reasonably have

17  been, discovered.  Solomon v. North Am. Life & Cas. Inc. Co.,

18  151 F.3d 1132 (9th Cir. 1998) (citation omitted).  Defendants

19  contend that plaintiff discovered the fraud when Iman first told

20  plaintiff he would be terminated if on disability leave, in

21  approximately 1998.  Arguably, however, plaintiff did not have

22  notice of the alleged fraud until August 1999, when an EDS

23  attorney informed plaintiff that Iman's 1998 representations

24  might have been false.  If, in fact, plaintiff did not discover

25  the fraud until 1999, the complaint would not be time-barred as

26  it was filed less than three years after August of 1999.  In

1 sum, there is an issue of disputed fact as to when plaintiff's

2 fraud claim might have accrued.  Thus, the court finds that when

3 plaintiff's fraud claim began to accrue is also a question

4 reserved for the jury.

5 **D.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

6     **1. <u>Statute of Limitations</u>**

7     The Ninth Circuit has explained that an IIED claim is

8 classified as a personal injury claim. <u>See</u> <u>Molski v. Gleich</u>, 318

9 F.3d 937, 958 (9th Cir. 2003).  Under California law, personal

10 injury claims are subject to a two-year limitations period.

11 <u>See</u> Cal. Civ. Proc. Code 335.1.[9]  A cause of action for

12 intentional infliction of emotional distress ("IIED") accrues

13 and the statute of limitations begins to run once plaintiff

14 suffers severe emotional distress as a result of outrageous

15 conduct on part of defendant.  <u>See</u> West's Ann. Cal. Civ. Proc.

16 Code § 340(3); <u>Cantu v. Resolution Trust Corp.</u>, 4 Cal.App.4th

17 857, 889 (1992).  Where, as here, the IIED claim arises out of

18 defendants' alleged false representations that he could not be

19 terminated without putting his disability benefits in jeopardy

20 and failing to terminate him as promised by the separation

21 agreement, courts have held that the statute of limitation

22 _____

23     [9]  Defendant mistakenly argues that claims for intentional
infliction of emotional distress are subject to a one-year statute
of limitations.  In 2002, however, California amended the

24 pertinent statute to provide for a two-year statue of limitations.
The statute was designated effective on January 1, 2003, <u>see</u> Cal.

25 Gov't Code § 9600, and has retroactivity effect only as to the
victims of the September 11, 2001 attacks.  <u>See</u> Cal. Civ. Proc.

26 Code § 940.10.

1  begins to accrue when the plaintiff is put on inquiry notice

2  that the defendant will not perform that contract.  <u>See</u>, <u>e.g.</u>,

3  <u>Averbach v. Vnescheconombank</u>, 280 F.Supp.2d 945, 958 (N.D. Cal.

4  2003).

5       It is undisputed that plaintiff was placed on notice that

6  defendants would not abide by the terms of the Separation

7  Agreement in December 1998.  It may be argued, however, that the

8  statute of limitations did not accrue until plaintiff was on

9  inquiry notice in 1999 when EDS' attorney suggested he could

10 have been terminated while on disability, and that Systemhouse

11 breached the separation agreement.  Whatever the case, plaintiff

12 filed his IIED claim at least one year too late.  It is

13 undisputed that plaintiff did not bring this action until 2002.

14 Thus, plaintiff's IIED claim is time barred under California's

15 two-year statute of limitations.  Defendants' motion for summary

16 judgment as to the IIED claim must be GRANTED.

17                               **IV.**

18                     **CONCLUSIONS AND ORDERS**

19      For the foregoing reasons, the court hereby ORDERS as

20 follows:

21      1.  Plaintiff's motion for summary adjudication as to the

22 breach of contract claim is GRANTED in part, and DENIED in part,

23 as consistent with this order;

24      2.  Defendants' motion for summary adjudication as to the

25 fraud claim is DENIED;

26 ////

1      3.  Defendants' motion for summary adjudication as to the

2  IIED claim is GRANTED; and

3      4.  All other motions are DENIED.

4      IT IS SO ORDERED.

5      DATED:  August 2, 2005.

```
                              /s/Lawrence K. Karlton
                              LAWRENCE K. KARLTON
                              SENIOR JUDGE
                              UNITED STATES DISTRICT COURT
```