

JAN - 6 2006

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JOHN HEALY,

                                        NO. CIV. S-02-1575 LKK/DAD

          Plaintiff,

     v.                                 **FINDINGS OF FACT
                                        AND CONCLUSIONS OF LAW**

MCI WORLDCOM NETWORK
SERVICE, INC., a Delaware
corporation; ELECTRONIC
DATA SYSTEMS CORPORATION,
a foreign corporation; and
EDS/SHL CORPORATION, a Delaware
corporation,

          Defendants.
_____/

     The above-captioned matter came on for a bench trial before
the undersigned commencing on November 8, 2005.  The matter was
argued on November 16, 2005.  The court ordered further briefing,
which was received on December 9, 2005.  The court now makes the
following findings of fact and reaches the following conclusions

1

of law[1]:

# I.

## FINDINGS OF FACT

1.   Systemhouse, Inc., a systems integration company, hired John Healy on June 4, 1993, as its Vice President of National Systems.  Plaintiff's job duties included managing, developing and growing state government business.  Plaintiff signed an Executive Employment Agreement on June 4, 1993 with Systemhouse, Inc.   That agreement provided that if the company terminated plaintiff, without cause, the executive would be paid 200% of one full year's base salary, plus 200% of the minimum incentive.

2.   Approximately one year later, Systemhouse decided to divest or reduce its investment in the National Systems Unit led by plaintiff.  As a result, on July 18, 1994, plaintiff and Systemhouse entered into a "Settlement Agreement" wherein Systemhouse agreed to terminate plaintiff on or before December 31, 1994, if the company did not sell its state government line of business or if it did not agree to make it a part of its "core strategy."  Under that agreement, Systemhouse promised to pay plaintiff $262,500 upon his separation.

3.   Systemhouse did not sell its state government line of business.  Nevertheless, it did not separate plaintiff on December 31, 1994.  Instead, Systemhouse chose to retain plaintiff.  To that

---

[1]   Any finding of fact that has been incorrectly treated as a conclusion of law should be recharacterized, and any conclusion of law that has been incorrectly treated as a finding of fact should be recharacterized.

2

1  end, Systemhouse and plaintiff entered into another Settlement
2  Agreement on February 28, 1995. As part of that agreement,
3  Systemhouse agreed to pay plaintiff $262,500 if it terminated his
4  employment in the future without cause.

5

6      4.    Thereafter, MCI Communications Corporation purchased
7  Systemhouse. Following the purchase, the company was known as "MCI
8  Systemhouse." Plaintiff remained employed in the same capacity
9  after the acquisition.

10     5.    In his capacity as an executive of MCI WorldCom's
11 subsidiary, Systemhouse, effective on February 4, 1998, plaintiff
12 received options to purchase 5500 shares of MCI WorldCom stock at
13 a price of $47.50 per share.

14     6.    Plaintiff also received Incentive Stock Units ("ISU") in
15 1997 and 1998. Under the terms of the ISU Agreements, plaintiff
16 could defer any portion of his incentive pay each year. Under the
17 ISU Agreements, MCI would match 25% of the number of shares
18 deferred by plaintiff. Plaintiff executed Deferral Agreements for
19 his ISU shares.

20     7.    Under normal circumstances, these ISUs, depending on
21 their type, would vest over three years. Plaintiff executed a
22 deferral agreement for his ISU shares. That portion of the ISUs
23 that constituted deferral of plaintiff's cash incentive awards
24 were, pursuant to the terms of the ISU Agreement, "always vested
25 and non-forfeitable." The remaining ISUs were to become vested and
26 non-forfeitable over the three years following the Grant Date. The

3

1  ISU Agreements also specified, in Section 3.7, that the non-vested
2  units would fully vest on the date of a termination of employment
3  not for cause.

4      8.   In addition to terms that address vesting, the ISU
5  Agreement addressed when those future rights matured, thereby
6  granting the employee control of the stock.  In other words,
7  delivery of vested stock was deferred until after it matured.

8      9.   The ISU Agreements provided that, within sixty days
9  following the "Maturity Date" of each portion of the units, MCI
10 would deliver shares of its stock to the employees.  The Plan
11 provided a minimum deferral date for maturity of three years,
12 longer if the participant agreed to it.  Plaintiff opted for a
13 three year deferral, meaning his 1997 ISU's stock would, in the
14 absence of termination without cause, mature on February 5, 2000
15 at the earliest, and his second grant in 1998, in the absence of
16 a termination without cause, would mature on February 4, 2001.

17     10.  Section 3.3 of plaintiff's February 5, 1998 Stock Option
18 Agreement provides for immediate vesting of Stock Option shares
19 upon a termination of employment without cause.  Section 3.5 of the
20 same agreement provides:  "Notwithstanding Section 3.3, if you
21 become disabled, the option will be exercisable for one year from
22 the date you commence receiving benefits under a Company sponsored
23 Short-Term Disability Plan, for a number of shares equal to the
24 number, if any, as to which the option is exercisable on the date
25 you commence receiving short-term disability benefits plus a pro-
26 rated portion of the shares, if any, of the option not then

                              4

1  exercisable, determined pursuant to Section 3.8"

2      11.  Section 3.8 of the 1998 Stock Option Agreement contains
3  the formula for determining the pro-rated vesting of shares and
4  provides "no such proration will under any circumstances be made
5  with respect to the shares of the Option to become exercisable on
6  the first anniversary of the Grant Date."

7      12.  On February 5, 1997, MCI granted plaintiff a sum total
8  of 5,257 shares.  The following year, on February 4, 1998, MCI
9  granted plaintiff a sum total of 688 additional ISU's.

10     13.  In early 1998, MCI Systemhouse informed plaintiff of its
11 decision to discontinue the state government services line of
12 business.  Barbara Iman, Vice President of Human Resources of MCI
13 Systemhouse, explained to plaintiff that MCI Systemhouse would
14 terminate him without cause due to that decision.

15     14.  As a result of MCI Systemhouse's decision, on May 15,
16 1998, plaintiff and MCI Systemhouse on behalf of its parents,
17 subsidiaries, successors and affiliates entered into a Separation
18 Agreement and General Release that set forth the terms of
19 plaintiff's separation.  The Agreement provided that "Mr. Healy
20 would be retained through August 1, 1998, at which time [he] will
21 be terminated."  It was agreed that the termination was without
22 cause.  The Agreement further provided that plaintiff would be paid
23 $262,500 in severance within ten (10) days of his termination.  The
24 Separation Agreement provided that plaintiff "will be permitted to
25 exercise his stock option grants in accordance with MCI's Stock
26 Option Plan.  The terms and condition of the 1997 deferred

5

1  incentive program for a termination without cause will apply."

2      15.  The Separation Agreement and General Release also
3  provides that plaintiff's Incentive Stock Units which were largely
4  deferred compensation were to fully vest on the date of his
5  termination of employment.

6      16.  Although there was some negotiation of certain peripheral
7  terms, the essential terms of the agreement were drafted by MCI
8  Systemhouse.

9      17.  Plaintiff suffered then, and now suffers from Brueger's
10  disease, which is a debilitating progressive disease which
11  ultimately resulted in total disability.  Barbara Iman was aware
12  of plaintiff's condition prior to the time the agreement was
13  consummated.

14      18.  Barbara Iman informed plaintiff that to obtain disability
15  benefits, he must retire before the effective date of his
16  termination.

17      19.  On July 22, 1998, plaintiff and his superiors at MCI
18  Systemhouse agreed to continue his employment though December 31,
19  1998.  When Ms. Iman learned of the agreement, she told plaintiff
20  that the verbal agreement did not supercede the written termination
21  date.

22      20.  On July 30, 1998, Barbara Iman told plaintiff that if an
23  employee who is to be terminated files for disability, that
24  individual's separation is placed on hold until he returns from
25  disability leave.  Iman told plaintiff that he needed to file for
26  disability benefits by the end of the next day because his

6

1  employment was to terminate on August 1, 1998, per the Separation
2  Agreement. Plaintiff questioned the accuracy of these statements,
3  but he did not investigate their accuracy.

4      21.   Plaintiff and MCI Systemhouse entered into a revised
5  "Separation Agreement and General Release" on September 10, 1998.
6  The relevant terms of the revised Agreement were identical to the
7  May 15 Separation Agreement except the termination date was changed
8  from August 1, 1998 to December 31, 1998.

9      22.   On December 8, 1998, plaintiff filed for disability
10  benefits. Subsequently, Hartford Life Insurance Company
11  ("Hartford"), the administrator of MCI WorldCom's short-term and
12  long-term disability plans, approved plaintiff's application for
13  short-term disability benefits. After plaintiff spent six months
14  on a short-term disability leave, Hartford approved his application
15  for long-term disability benefits. Plaintiff thereafter received
16  long-term disability benefits under MCI WorldCom's long-term
17  disability plan.

18      23.   Barbara Iman told plaintiff that she had checked with
19  corporate Legal and that because plaintiff had gone on disability,
20  he could not be terminated, and thus could not receive the benefit
21  of the Separation Agreement until he: (a) returned to work; (b)
22  reached 65 years of age; or (c) died. Barbara Iman had not checked
23  with the corporate legal department as to whether plaintiff could
24  be terminated while on disability, and thus that statement was an
25  intentional falsehood, which MCI intended plaintiff to rely on.
26  ////

7

1          24.   As noted, Barbara Iman had not checked with the legal
2    office.   Iman's statements to plaintiff relative to obtaining his
3    benefits under the Separation Agreement were false, although she
4    believed them to be true.   Given the risk of harm, particularly
5    plaintiff's serious medical condition, the statements were made
6    with reckless disregard of the truth and plaintiff's rights.

7          25.   Plaintiff applied for disability payments prior to the
8    effective date of his retirement, by virtue of, and in reliance on,
9    Barbara Iman's statement that he was required to do so in order to
10   receive those benefits.   Given her position with the company and
11   his serious medical condition, such reliance was reasonable.

12         26.   On or about April 22, 1999, defendant Electronic Data
13   Systems Corporation ("EDS") purchased MCI Systemhouse, and that
14   entity became known as EDS Systemhouse.   EDS received a credit on
15   the total sales price by virtue of the outstanding liability under
16   plaintiff's Separation Agreement.   The Sales Agreement provided,
17   inter alia,

18         There is an outstanding executive termination of
           employment agreement for an executive who is currently
19         in a short-term disability status (in scope).   His
           signed agreement requires the payment of $274,000 (sic)
20         if/when he returns to regular payroll, at which time he
           will be terminated and paid.   While in the STD status
21         the company is responsible for 2/3 of his salary and
           health coverage.   There is the potential he will go into
22         an LTD status at the end of 180 days of STD.   He will
           remain on MCI WorldCom payroll and benefits until he
23         returns from either STD or LTD status.

24         This paragraph referred to plaintiff.

25         27.   Following the merger with EDS on May 1, 1999, plaintiff
26   moved to the MCI WorldCom corporate payroll.   EDS never carried

                                      8

1  plaintiff as an employee on its records.

2      28.   In August 1999, plaintiff inquired of EDS as to which
3  company was responsible for the benefits due him under the
4  Separation Agreement.   Plaintiff received a communication from
5  Dorothy Culham, an attorney for EDS, which stated that "[i]t
6  appears from the MCI LTD [long-term disability] Plan's website that
7  an employee can perhaps continue to receive MCI LTD benefits even
8  though he/she is no longer an active MCI employee, so long as
9  he/she was an active employee when he/she commenced benefits."
10 Culham's response was made after her review of various pertinent
11 documents.

12     29.   Thereafter, for about two years, plaintiff engaged in a
13 series of fruitless communications with MCI and EDS as to his
14 status and those companies' responsibility for the benefits due him
15 under the Separation Agreement.

16     30. Neither company would accept responsibility for liability
17 under the Separation Agreement.

18     31.   In early 2000, plaintiff received a statement from MCI
19 WorldCom advising him of the status of his ISU shares; that
20 statement indicated that all of plaintiff's 1997 ISUs were vested
21 as of January 26, 2000 and that the deferral end date for the
22 voluntary deferral shares and matching awards was February 5, 2000;
23 the statement also indicated that plaintiff's voluntary deferral
24 shares from his 1998 ISU award were vested and that the voluntary
25 deferral and matching awards have an end date of February 4, 2001.
26 ////

9

1     32. After receiving the statement, plaintiff called Tom

2  Squires, the MCI WorldCom "Plan Administrator" for the ISU Plan.

3  Mr. Squires informed plaintiff that the ISUs would not be

4  distributed because plaintiff was on disability.

5     33. Mr. Squires was wrong when he advised plaintiff that he

6  could not receive the ISU shares because he was on disability

7  leave.

8     34. In the sixty days following December 31, 1998, the price

9  of MCI stock ranged in value from a low of $69.88 per share

10  (January 4, 1999) to a high of $85.88 per share (February 25,

11  1999). Hence, if plaintiff had liquidated his ISUs within that

12  sixty-day window, he would have netted between $415,436 and

13  $510,556.

14     35. On June 13, 2001, plaintiff received a communication from

15  Dorothy Culham, the "kiss off" letter, which denied any liability

16  on the part of EDS and suggested that plaintiff seek relief from

17  MCI. Ms. Culham consulted with the chief of the labor division of

18  EDS' legal department before sending the kiss off letter. The

19  letter was intended to and did communicate EDS' position concerning

20  plaintiff's separation agreement benefits to both plaintiff and

21  MCI.

22     36. Ms. Culham's denial of EDS liability was unjustified in

23  that she knew that EDS and MCI were jointly and severally liable

24  for the benefits due under the Separation Agreement. Thus, her

25  statement that EDS was without liability was an intentional false

26  statement which EDS intended plaintiff to rely on. Again,

10

1 │ under the totality of the circumstances, plaintiff reasonably
2 │ relied upon these representations to his detriment.

3 │     37. Upon receiving Culham's letter, plaintiff contacted Ken
4 │ Reiss, an attorney for MCI. He inquired as to all benefits due
5 │ under the Separation Agreement.

6 │     38. There is a statement in evidence that on August 12, 2001,
7 │ MCI deposited all of plaintiff's 1997 ISUs into his account. There
8 │ is no evidence that the statement was prepared in the ordinary
9 │ course of business and that, in fact, the shares were so deposited.
10 │ Given the repeated denial by MCI of plaintiff's right to receive
11 │ the ISUs, the court does not credit the statement as accurate.

12 │     39. Plaintiff suffered severe anxiety and emotional and
13 │ mental distress throughout the seven-year period following his
14 │ termination and this trial. The denial of the benefits provided
15 │ for by the Separation Agreement added to his anxiety and emotional
16 │ and mental distress.

17 │     40. Given the absence of argument from defendant, the court
18 │ concludes that plaintiff's method of calculating economic damages
19 │ is reasonable, see attachments, and thus concludes that damages
20 │ regarding stock options including prejudgment interest are
21 │ $599,797.03, damages regarding ISUs are $1,312,567.01, and
22 │ severance pay damages are $412,624.44.

23 │                              **II.**

24 │                    **CONCLUSIONS OF LAW**

25 │     The case is before the court on diversity jurisdiction. Thus,
26 │ California law applies.

11

1    The court begins by noting that EDS purchased MCI Systemhouse.
2  EDS concedes that "it is liable as a successor corporation to MCI
3  Systemhouse if MCI breached plaintiff's separation agreement."
4  Moreover, at trial defendant conceded that it was liable for all
5  of plaintiff's damages, save and except those related to punitive
6  damages.  As to this matter, defendant relies on Potlach Corp. v.
7  Sup. Ct., 154 Cal.App.3d 1144 (1997), for the proposition that a
8  corporation is not liable for tort damages, including punitive
9  damages, caused by a predecessor that it had acquired through a
10  stock purchase. Defendant's reliance on Potlach is misplaced.  The
11  court there did not hold that, as a general proposition, a
12  corporation acquiring another corporation is not liable for the
13  latter's tort damages.   Rather, the court explained that the
14  corporation at issue, was not liable as a successor corporation
15  because it had not acquired any of its assets.  The court noted
16  that, as a shareholder, Potlach owns no part of the specific
17  property and was not liable because it did not continue the
18  business of its predecessor.  Id. at 1150.  The facts of Potlach
19  are clearly distinguishable from the case at bar.

20    EDS also seeks to avoid liability for punitive damages
21  premised upon Cates Constr., Inc. v. Talbott Partners, 21 Cal.4th
22  28, 61 (1999).  Again, that line of cases is inapposite, in that
23  it relies on the proposition that punitive damages are unavailable
24  where a plaintiff's fraud claim is premised upon the same facts
25  underlying a breach of contract claim.  Here, a distinction exists
26  between the breach of contract claim and the fraud claim in that

12

1  plaintiff premises the fraud claim upon Barbara Iman's
2  misrepresentations about the legality of terminating plaintiff's
3  employment by virtue of his disability status, and fraudulent
4  statements regarding her having checked the matter with the legal
5  department. Plaintiff also seeks to impose liability by virtue of
6  Doroth Culham's "kiss off" letter. The court concludes that
7  defendant is liable for any and all damages sustained by plaintiff.
8  See Schwartz v. Pillsbury, Inc., 969 F.2d 840 (9th Cir. 1992); Ray
9  v. Alad Corp., 19 Cal.3d 22 (1977).

10  **B.   BREACH OF CONTRACT**

11       On summary judgment, the court held that MCI breached the
12  September 1998 contract when it failed to terminate plaintiff on
13  December 31, 1998.  That determination was premised upon the
14  language of the Separation Agreement which the court found was
15  unambiguous and required no extrinsic evidence to determine what
16  the parties intended by the agreement.[2]

17       Accordingly, the court determined that the $262,500 in
18  severance pay was due within ten days of the termination that
19  should have occurred.  Relative to the ISUs, the court has
20  determined that they should have immediately vested upon the date
21  of termination.  While ambiguity may be found in the Incentive
22  Stock Unit Agreement, such ambiguity was resolved in the Separation
23  Agreement, which provides "the terms and conditions of the 1997

24  _____

25  [2]  The court notes that it has now received all relevant
    evidence concerning the negotiations and circumstances under which
26  the Separation Agreement was entered into.  I conclude that that
    evidence fully supports the determination made on summary judgment.

13

1  Deferred Incentive Program for a termination without cause will
2  apply." Defendant maintains that the disability clause of the ISU
3  Agreement with the "notwithstanding" language trumps the
4  termination for cause language in the ISU agreement. That argument
5  ignores the language contained in the Separation Agreement.  The
6  parties had much experience with written agreements superseding
7  previous written agreements and there is no reason to doubt that
8  what the Separation Agreement said is what the parties meant.

9      The court also credits plaintiff's testimony about when he
10  would have sold his stock.  However, the question remains as to
11  whether prejudgment interest should apply since it cannot be said
12  with absolute certainty which day the plaintiff would have sold the
13  stock.   Nonetheless, the court concludes that the sum that
14  plaintiff suffered in damages is reasonably ascertainable, and he
15  should not be deprived of prejudgment interest because the conduct
16  of the defendant makes it impossible to determine exactly the date
17  that plaintiff would have sold the stock.

18      Relative to the stock options, as the court noted in its order
19  on the parties' motions for summary judgment, the Separation
20  Agreement does not explicitly specify that the termination without
21  cause provision applies.  As the court determined there, it was
22  unclear which provision, the termination without cause or the
23  disability provision, would apply. As the court noted, there was
24  a latent ambiguity and thus the court deferred resolution of the
25  matter to trial.  Upon trial the court finds that no facts were
26  tendered which clarified the question.

14

1    Under California law, the default rule for construction of
2  contracts is that they should be interpreted "most strongly against
3  the party who caused the uncertainty to exist." Cal. Civ. Code
4  § 1654.   That rule does not apply when an agreement is "actively
5  negotiated." Herring v. Teradyne, Inc., 256 F.Supp.2d 1118 (S.D.
6  Cal. 2002); Dunne & Gaston v. Keltner, 50 Cal.App.3d 560, 563 n.3
7  (1975).  The court has concluded, however, that while there were
8  negotiations at the periphery, the essential terms of the
9  Separation Agreement were drafted by Systemhouse, as of course the
10  Stock Option Agreement was.  Under the circumstances, the court
11  concludes that the termination without cause clause should apply.
12  **C.   FRAUD**

13    The remaining claim which must be considered by the court is
14  plaintiff's cause of action for intentional fraud.[3]

15    In the findings of fact, the court concluded that there were
16  two instances of intentional misrepresentation.  The first being
17  the statement by Barbara Iman that she had checked with the legal
18  department and that they had told her that plaintiff could not be
19  discharged while he was on disability.  The court concluded that
20  that statement was intentionally false.  Connected to Barbara
21  Iman's intentionally false statement was a statement made in
22  reckless disregard of the truth, which was that her independent
23  knowledge was that plaintiff could not be terminated while on
24  disability.  It appears that California law imposes liability for

25  _____
26  [3]  It should be recalled that the plaintiff voluntarily
dismissed his claim for negligent misrepresentation.

15

1  reckless statements only if the speaker does not believe the
2  statement is true.  Bily v. Arthur Young & Co., 3 Cal.4th 370, 415
3  (1992).  Nonetheless, the court views the two statements as so
4  intimately connected that the doctrine has no application in the
5  instant matter.

6      The second false statement is the representation made by
7  Dorothy Culham that EDS had no liability relative to the Separation
8  Agreement that plaintiff had entered into with MCI.  Again, the
9  court has found that that statement was knowingly false.

10     Defendant objects to any finding of liability relative to the
11 Culham statement on two bases.  I consider them below.

12     First, it notes that the plaintiff's complaint does not allege
13 that statement as a cause of action.  Defendant argues that the
14 requirement for more specific allegations of fraud under Fed. R.
15 Civ. P. 9 suggests that the absence of such a pleading precludes
16 resting liability upon the statement.  The court cannot agree.

17     The evidence was received throughout the course of trial
18 without objection.  It is, of course, proper for the court to
19 conform the pleadings to the evidence received in trial.  See Fed.
20 R. Civ. P. 15(b), and a proper remedy may be granted under Fed. R.
21 Civ. P. 54(c), whether or not a formal amendment is sought.  See
22 10 James Wm. Moore, et al., Moore's Federal Practice §
23 54.70[2] ("Rule 15(b) permits an amendment to the pleadings when
24 issues not raised in those pleadings are tried by the express or
25 implied consent of the parties.  Under Rule 15(b), the pleadings
26 may be amended to reflect the introduction of the issues or claims,

16

1 & appropriate relief may be awarded on them under Rule 54(c). . .
2 the introduction of the issues or claims is effective whether or
3 not the pleadings are actually amended . . .).

4        The second objection is that Ms. Culham's statement was a
5 matter of her interpretation of the law, was thus a statement of
6 opinion rather than fact, and could not therefore form the basis
7 of liability.  That contention cannot prevail. It is well-
8 established California law that misrepresentations of law are
9 actionable where the speaker may reasonably be assured by the
10 hearer as having superior knowledge, <u>see</u> <u>Bowman v. Payne</u>, 55
11 Cal.App. 789, 796 (1921), where the opinion is stated as fact,
12 <u>Dvorak v. Latimer</u>, 91 Cal.App. 664, 672 (1928)(citations omitted),
13 and where the misrepresentation is one of mixed fact and law. <u>De</u>
14 <u>Zemplen v. Home Fed. Sav. & Loan Ass'n</u>, 221 Cal.App.2d 197, 202
15 (1963). Each of these circumstances applies to the case-at-bar.

16       Give all the above, the court concludes that plaintiff should
17 prevail in his fraud action.  The court must now determine the
18 amount of damages beyond those economic damages determined
19 appropriate in the findings of fact.

20 **D.   FRAUD DAMAGES**

21       California law provides that "[o]ne who willfully deceives
22 another with intent to induce him to alter his position to his
23 injury or risk, is liable for any damages which he thereby
24 suffers." Cal. Civ. Code § 1709. It is established that an
25 employee may recover tort damages "where he can establish all of
26 the elements of fraud" and the misrepresentation was "not aimed at

17

1 effecting termination of employment."  See Hunter v. Up-Right,
2 Inc., 6 Cal.4th 1174, 1185 (1993); and see Miller v. Fairchild
3 Industries, Inc., 885 F.2d 498, 509-510 (9th Cir. 1989). Contrary
4 to defendant's position, the misrepresentations found by the court
5 deal with the timing of the receipt of the benefits due plaintiff
6 under the Separation Agreement, and are thus distinct from the
7 breach of contract which occurred when MCI failed to terminate Mr.
8 Healy.   Put differently, but to the same effect, if MCI had
9 terminated plaintiff (and thus not breached the Separation
10 Agreement) defendant would still be guilty of fraud because of
11 MCI's assertion that plaintiff's disability status precluded his
12 receipt of his contract benefits, and because of EDS'

13 representation that it was without liability. Moreover, both the
14 representation that Ms. Iman had checked with Legal, and the
15 representation by Ms. Culham that EDS had no responsibility
16 relative to the Separation Agreement were completely independent
17 of the breach of contract.

18    **1.  Pain and Mental Suffering**

19    Assessing damages under the facts is quite difficult.   There
20 is no doubt that the fraud perpetrated on plaintiff contributed in
21 a substantial way to his mental anguish. The court notes, however,
22 that there were many stresses in plaintiff's life independent of
23 the stress caused by the defendant's wrongful conduct.   Under
24 California law, however, the defendant takes the plaintiff as he
25 finds him.   Thus, where a plaintiff suffers injury by reason of
26 defendant's conduct and other contributing factors, the rule

18

1  permits holding the defendant liable for the entire injury. See 6
2  Witkin, Summary of California Law, 1198-99 (10th Ed.), and the
3  cases collected therein.    The Court awards $500,000.00 as
4  compensatory damages.

## 2.  Punitive Damages

6     Cal. Civ. Code § 3294(a) provides that "[i]n an action for the
7  breach of an obligation not arising from contract, where it is
8  proven by clear and convincing evidence that the defendant has been
9  guilty of . . . fraud . . . the plaintiff, in addition to the
10 actual damages may recover damages for the sake of example and by
11 way of punishing the defendant." Given that the court has
12 concluded that defendant and its predecessor were guilty of
13 intentional deceit, and that guilt is clear and convincing,
14 plaintiff is eligible for an award of punitive damages. Moreover,
15 as the court has noted, the defendant and its predecessor were well
16 aware that plaintiff was especially vulnerable, thus making their
17 conduct more blameworthy than even an ordinary fraud.    It is
18 important, however, to distinguish between MCI's and EDS' general
19 refusal to honor their contractual commitments, for which punitive
20 damages may not be awarded, and the two relatively isolated
21 instances of fraud which the court has found. The court does not
22 mean to minimize the wrongful conduct, nor the damages caused
23 thereby. Nonetheless, the Court cannot award punitive damages for
24 the entirety of defendants' shabby conduct. On the other hand it
25 is important, given the size of the defendant, that the award not
26 be so small as to be considered de minimis. The Court awards

19

1  $200,000 in punitive damages.

2                                   **III.**

3                                 **ORDERS**

4       The Court orders that judgment be entered for plaintiff and

5  against defendant as follows:

6       1.   Economic Damages, including prejudgment interest in the

7  amount of $2,324,988.48;

8       2.   Pain and Mental Anguish in the amount of $500,000.00; and

9       3.   Punitive Damages in the amount of $200,000.00.

10      Plaintiff is ordered to file his motion for attorney's fees

11 not later than twenty (20) days after the date of this order.

12 Defendant may file a response within twenty (20) days thereafter.

13 That matter will then stand submitted.

14      The Clerk is directed to ENTER JUDGMENT in accordance with

15 this order.

16      IT IS SO ORDERED.

17      DATED:   January 6, 2006.

18
                                      /s/Lawrence K. Karlton
19                                    LAWRENCE K. KARLTON
                                      SENIOR JUDGE
20                                    UNITED STATES DISTRICT COURT

21

22

23

24

25

26

                                  20

**ISU DAMAGES SCENARIO A**
DAMAGE CALCULATIONS FOR INCENTIVE STOCK UNITS (ISU)
ALL ISU SHARES ON EXHIBIT ~~DDDD~~ CCCC

| | |
|---|---|
| Sale Date: | March 30, 1999 |
| Sale Price (per Exhibit FFFF): | 93.938/share |
| Number of Shares (per Exhibit DDDD): | 7,394 |
| Principal Amount: | $694,483.63 |
| | (7,394 x $93.938) |

| | |
|---|---|
| March 30, 1999 to 2000<br>(year one interest) | $694,483.63<br>X_____.10<br>$ 69,448.36 |
| March 30, 2000 to 2001<br>(year two interest) | $763,931.99<br>X_____.10<br>$ 76,393.20 |
| March 30, 2001 to 2002<br>(year three interest) | $840,325.19<br>X_____.10<br>$ 84,032.52 |
| March 30, 2002 to 2003<br>(year four interest) | $924,357.71<br>X_____.10<br>$ 92,435.77 |
| March 30, 2003 to 2004<br>(year five interest) | 1,016,793.48<br>X_____.10<br>$101,679.35 |
| March 30, 2004 to 2005<br>(year six interest) | 1,111,847.28<br>X_____.10<br>$111,847.28 |
| March 30, 2005 to<br>November 30, 2005<br>(final year interest) | 1,230,320.11<br>X_____.10<br>$ 82,246.90 |

**TOTAL PRINCIPAL PLUS INTEREST
FOR ISU COMPENSATION**          **$1,312,567.01**

## DAMAGE CALCULATIONS FOR STOCK OPTIONS

Sale Date:                                                             March 30, 1999
Sale Price:                                                            93.938/share
Option Price:                                                          47.500/share
Price Differential:                                                    46.438/share
Number of Shares
(1.2439 per share adj. for Worldcom merger):                           6,841
Principal Amount:                                                      $317,682.36
                                                                       (6,841 x $46.438)


March 30, 1999 to 2000                    $317,682.35
(year one interest)                       X          .10
                                          $ 31,768.24

March 30, 2000 to 2001                    $349,450.59
(year two interest)                       X          .10
                                          $ 34,945.06

March 30, 2001 to 2002                    $384,395.65
(year three interest)                     X          .10
                                          $ 38,439.57

March 30, 2002 to 2003                    $422,835.22
(year four interest)                      X          .10
                                          $ 42,283.52

March 30, 2003 to 2004                    $465,118.74
(year five interest)                      X          .10
                                          $ 46,511.87

March 30, 2004 to 2005                    $511,630.61
(year six interest)                       X          .10
                                          $ 51,163.06

March 30, 2005 to                         $562,793.37
November 30, 2005                         X          .10
(final year interest)                     $ 37,003.66


### TOTAL PRINCIPAL PLUS INTEREST
### FOR STOCK OPTIONS                     $599,797.03

## SEVERANCE DAMAGES SCENARIO B
DAMAGE CALCULATIONS FOR $262,500 SEVERANCE PAYMENT
ADJUSTED FOR OCTOBER 2005 BANKRUPTCY PAYMENT

| | | |
|---|---|---|
| Due Date: | | January 10, 1999 |
| Principal Amount: | | $262,500.00 |

| | |
|---|---|
| January 10, 1999 to 2000 (year one interest) | $262,500.00<br>X    .10<br>$ 26,250.00 |
| January 10, 2000 to 2001 (year two interest) | $288,750.00<br>X    .10<br>$ 28,875.00 |
| January 10, 2001 to 2002 (year three interest) | $317,625.00<br>X    .10<br>$ 31,762.50 |
| January 10, 2002 to 2003 (year four interest) | $349,387.50<br>X    .10<br>$ 34,938.75 |
| January 10, 2003 to 2004 (year five interest) | $384,326.25<br>X    .10<br>$ 38,432.63 |
| January 10, 2004 to 2005 (year six interest) | $422,758.88<br>X    .10<br>$ 42,275.89 |
| January 10, 2005 to<br>October 30, 2005<br>(portion final year interest) | $465,034.77<br>X    .10<br>$ 38,732.75 |
| **LESS October 2005 Payment**<br>**($144,000 x .6563 - ratio of severance and**<br>**attorney fees to overall claim)** | **($94,507.20)** |
| November 1, 2005 to<br>November 30, 2005<br>(final month interest) | $ 3,364.12 |
| **TOTAL PRINCIPAL PLUS INTEREST**<br>**FOR SEVERANCE PAYMENT** | **$412,624.44** |